**Randall BLACK et al., Plaintiffs,**

v.

**Abraham BEAME, Individually and as Mayor of the City of New York, et al., Defendants.**

No. 75 Civ. 5827 (MP).

United States District Court,
S. D. New York.

Aug. 30, 1976.

Children's Rights Project, New York Civil Liberties Union by Marcia Robinson Lowry, and Peter Bienstock, New York City, for plaintiffs.

W. Bernard Richland, Corp. Counsel, New York City by Carmella Ackman, New York City, for defendants Beame, Dumpson, Parry, Beine, Dall and Farrell.

Edward W. Norton, Gen. Counsel, New York City Housing Authority, New York City by Jeanne Hollingsworth, New York City, for defendants Christian and Reichardt.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City by Amy Juviler, New York City, for defendants Shapiro and Berger.

Davis, Polk & Wardwell, New York City by Richard E. Nolan and Alfred E. Schretter, New York City, for defendant Monsignor Edmund F. Fogarty, individually and as Administrator of the Mission of the Immaculate Virgin.

## OPINION

POLLACK, District Judge.

This matter is before the Court on motions to dismiss the suit for lack of subject

matter jurisdiction, lack of standing to sue, insufficiency of the claims and absence of an indispensable party (the plaintiffs' mother, Mrs. Black).

This is a civil rights action for declaratory and injunctive relief and damages pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202 seeking to protect and redress rights guaranteed by the First, Ninth and Fourteenth Amendments of the United States Constitution, Titles IV and XX of the Federal Social Security Act, 42 U.S.C. §§ 601 *et seq.*, 1397 *et seq.*, and New York State Law.

Jurisdiction of the action is posited under 28 U.S.C. §§ 1343(3) and (4) and § 1331 and under the doctrine of pendent jurisdiction.

The defendants, public officials and child care agency representatives, are charged herein with allegedly failing to provide the nine infant plaintiffs with public and private aid sufficient to keep their family intact; with allegedly failing to provide them with an apartment sufficiently large to accommodate the whole family; and allegedly failing to supply their mother with sufficient counselling services.

Plaintiffs are nine infant children of Mrs. Frances Black; they range from four to fifteen years of age. The action is brought on behalf of the nine by "their attorneys and next friends," Marcia Robinson Lowry and Peter Bienstock.[1]

### The Complaint

The plaintiffs allege as their complaint, the following:

Mrs. Frances Black is 38 years old and receives Aid to Families with Dependent Children both for herself and to support her children (¶ 28). She has 15 children, only nine of whom are accounted for in the complaint. Four of the nine reside at the Mission of the Immaculate Virgin in Staten Island, a large child care institution, and the remaining five reside with their mother. The four who reside at the Mission have not been provided with the services necessary to leave that institution and be reunited with their mother, sisters and brothers (¶ 32). They were voluntarily placed in foster care by their mother in January 1971 (¶ 42). Welfare benefits and services have been denied and delayed to the nine children and their mother and she has been humiliated and intimidated in attempts to secure adequate public assistance and housing for the nine (¶ 33). The right of the nine to continuous care of their mother in a stable home environment has been placed in jeopardy or denied (¶ 34). Mrs. Black and her children have for some time past had and still have inadequate housing for the family; presently that consists of a four bedroom apartment furnished by the New York City Housing Department in the public housing project at 870 Columbus Avenue, New York City (¶ 35–40). The four at the Mission have asked, fruitlessly, to be reunited with the rest of their family (¶ 45). The mother terminated her gainful employment in March 1975 (¶ 51) and at a visit to her home by a Social Services caseworker in October 1975 she was threatened with removal of the remaining five children and their placement in foster care (¶ 52), which placement the five at home do not want (¶ 52, 53).

The complaint contends that the public officials and welfare and child care agencies owe the Blacks a statutory and constitutional responsibility to supply the children "with services which would enable them to remain together, if at all possible" (¶ 55).

### The Prior Proceedings

Shortly after the filing of the complaint, plaintiffs sought a preliminary injunction to prevent the defendants from taking any steps to institutionalize the five plaintiffs who currently reside with their mother. An injunction was denied, the opinion stating, in part:

[i]n the present case there has been neither a termination or reduction of bene-

---

1. Since filing and argument of these motions Mr. Bienstock has been relieved as counsel for plaintiffs.

fits. Moreover, not only may it be seri-ous[ly] questioned whether the complaint presents facts raising a substantial feder-al question, but it may be that neither welfare nor housing nor the alleged free-dom from harassment and intimidation is a constitutional right; for that matter, continuous care by a mother is not neces-sarily an unqualified privilege.

## The Motions—Procedural Matters

The City Housing Authority, with other defendants joining it, questions whether the issues presented are ripe for decision and whether the children have standing to raise them. They argue that Mrs. Black has not properly requested that the four children she delivered for foster care be returned home or properly requested that she be given a larger apartment or better services. They contend, for example, that she has not provided the Housing Authority with an accurate count of the number of members of her family. Furthermore, those defend-ants say that the Authority has a contractu-al relationship only with Mrs. Black and not with her litigating offspring or their next friends. Consequently, Mrs. Black is an indispensable party and without her as a party the suit must be dismissed, according to defendants.

■ It is settled law that unless a mat-ter has reached the stage of actual contro-versy a federal court will not adjudicate a suggested constitutional question therein. *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). This ripeness doctrine not only imposes bounds on the Court's consideration of constitution-al issues, but also provides the courts with an upper limit on the exercise of their dis-cretion in the consideration of applications for injunctive and declaratory relief; *Ab-bott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The

purpose of requiring that disagreements ripen to controversy before being heard by the courts is

> to prevent the courts, through avoidance of premature adjudication, from entan-gling themselves in abstract disagree-ments over administrative policies, and also to protect the agencies from judicial interference until an administrative deci-sion has been formalized and its effects felt in a concrete way by the challenging parties. *Abbott, supra* at 148–49, 87 S.Ct. at 1515.

■ Therefore, though plaintiffs do not raise any exhaustion issue directly, there is in cases involving state agency action an element common to the doctrines of ripe-ness and exhaustion of state administrative remedies. *See Fuentes v. Roher,* 519 F.2d 379, 386 (2d Cir. 1975); *Plano v. Baker,* 504 F.2d 595 (2d Cir. 1974).[2] Under that latter doctrine as it is applied in this Circuit, state administrative remedies must be exhausted before the bringing of a § 1983 action if those remedies are speedy, *Blanton v. State University,* 489 F.2d 377, 383 (2d Cir. 1973), adequate and not futile, *Eisen v. Eastman,* 421 F.2d 560 (2d Cir. 1969), *cert. denied,* 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970).

■ In general, a controversy over an agency's action or inaction is deemed ripe for adjudication if (1) it presents legal is-sues fit for resolution, and (2) the action or inaction of the agency has a "direct and immediate impact" on the plaintiffs. *Ab-bott Laboratories, supra.*

■ The same considerations are at least partially relevant to the issue of standing. As noted by the Supreme Court in *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962):

**2.** The Supreme Court in *dicta* has declared that "[w]hen federal claims are premised on 42 U.S.C § 1983 and 28 U.S.C. § 1343(3)—as they are here—we have not required exhaus-tion of state judicial or administrative reme-dies, recognizing the paramount role Con-gress has assigned to the federal courts to

protect constitutional rights." *Steffel v. Thompson,* 415 U.S. 452, 472–3, 94 S.Ct. 1209, 1222, 39 L.Ed.2d 505 (1974). However, the Court of Appeals for this Circuit, "albeit with some hesitation [citation omitted] has continued to require exhaustion of adminis-trative remedies." *Fuentes, supra,* at 386.

The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'

In testing the plaintiffs' standing to assert the claims raised, the Court must determine (1) whether plaintiffs allege that they have suffered an "injury in fact;" and (2) "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing Service v. Camp*, 397 U.S. 150, 152–3, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *see also Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Evans v. Hills*, 537 F.2d 571 (2d Cir. 1976). It must be clear that there is a "logical nexus" between the plaintiffs' status and the substantive claims they raise; and, therefore, the Court is obliged to consider those substantive claims in testing plaintiffs' standing. *Flast v. Cohen, supra* 392 U.S. at 101–102, 88 S.Ct. 1942.

■ There is no doubt that the complaint seeks redress for an alleged injury in fact to plaintiffs' purported right to live together with their mother and siblings. The division of a family, whether caused voluntarily or involuntarily, may injure the children involved in ways too numerous and elusive to enumerate. Its impact is direct and immediate, though in many cases, it is an injury that may never be cured at all or may be cured only by non-judicial means. *See Pena v. Kissinger*, 409 F.Supp. 1182, 1184 (S.D.N.Y.1976) for an allegation of an analogous injury to family life. Plaintiffs have clearly alleged an injury in fact sufficiently direct and immediate to satisfy both the ripeness and standing doctrines.

It is also clear that the interests plaintiffs seek to protect *arguably* fall within both the ambit of that portion of the Constitution's penumbra which protects family life[3] and the articulated goals, if not the binding provisions, of the Aid to Families with Dependent Children (AFDC) and state welfare statutes.[4] The legal substance of plaintiffs' allegations is subject to serious question, but most of those allegations are presently fit for resolution and there is a logical nexus between them and plaintiffs' status of separation.

■ The Authority's assertion that Mrs. Black has failed to properly request a transfer to a larger apartment not only raises an issue of fact not soluable on the record before the Court, but is also defused by plaintiffs' claim that the defendants have discouraged the exercise of their rights and generally harassed them. Again, there may be serious questions concerning the factual and legal merit of plaintiffs' claim, but that claim suffices to lay to rest at this stage of the litigation any exhaustion issue under the ripeness doctrine. Plaintiffs' general assertion that the Housing Authority resisted helping them or their mother in their alleged efforts to reunite their family makes it clear that whatever remedies were available to plaintiffs or their mother cannot, on this record and given the claims of the complaint, be termed speedy, adequate or useful.

Therefore, as to all of the plaintiffs' claims but one, there is standing and ripeness, though there may be no legal redress for the alleged claims.

■ The single claim in the complaint that is self-evidently not ripe for decision is the claim that certain defendants have "threatened" to begin legal actions to

---

**3.** *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). These cases establish the constitutional interest plaintiffs seek to protect. The substantive issue presented to the Court is not whether the interest exists, but whether it requires the type of protection plaintiffs claim is constitutionally mandated.

**4.** *See* 42 U.S.C. §§ 601, 608(f); 45 C.F.R. § 233.110(a)(2)(iii); New York Social Services Law §§ 407.1, 344.2; New York Public Housing Law § 2.

bring even more of Mrs. Black's children into foster care institutions. It cannot reasonably be gainsaid that a threat to institute legal proceedings in the Family Court to determine what shall constitute appropriate protection of the best interests of the child in question, when properly pursued, does not violate a civil right or raise justiciable issues. This Court should not be expected to render an advisory opinion on the propriety of future foster care placements.[5]

▆▆ Given Mrs. Black's undeniable involvement in plaintiffs' claims, it is clear that she has "an interest relating to the subject of this action" under Rule 19(a), Fed.R.Civ.P. However, it is not at all clear on the current record that her absence would in any way impair or impede her ability to protect that interest, Rule 19(a)(i), or subject any parties to a substantial risk of incurring the sort of "double, multiple, or otherwise inconsistent obligations" against which Rule 19(a)(ii) was meant to protect. In addition, it is the general rule that if the merits of an action may be determined without prejudice to the absent party, "it will be done; and a court of equity will strain hard to reach that result." *Bourdieu v. Pacific Oil Co.,* 299 U.S. 65, 70, 57 S.Ct. 51, 53, 81 L.Ed. 42 (1936); *Mallis v. Federal Deposit Insurance Corp.,* 407 F.Supp. 7, 12 (S.D.N.Y.1975); *Charron v. Meaux,* 60 F.R.D. 619, 622 (S.D.N.Y.1973).

At any rate, there is no indication that Mrs. Black's joinder would not be possible and the Housing Authority's motion for dismissal on this ground is without merit.

*The Legal Insufficiency*

Though the claim that the federal questions herein are too insubstantial to support subject matter jurisdiction over the complaint is technically procedural in nature, both it and the defendants' Rule 12(b)(6) motion test the legal sufficiency of the com-

plaint and, therefore, the two motions will be considered together. These motions go to the heart of plaintiffs' complaint and in order to assess them it is necessary to make some order out of that rambling document.

Judging from the answering papers, plaintiffs are pressing five legal arguments; (1) that the defendants have interfered with their right to familial privacy under the First, Ninth and Fourteenth Amendments; (2) that defendants have failed to adopt a foster care system that is "least restrictive" of that and other of plaintiffs' constitutional rights; (3) that defendants have violated plaintiffs' right not to be subjected to cruel and unusual punishment; (4) that defendants have delayed and discouraged the exercise of plaintiffs' right not to be deprived of welfare and housing services without due process of law; and (5) that defendants have violated alleged federal and state statutory mandates that governmental benefits be distributed in such a way as to keep families together rather than drive them apart.

The basis of plaintiffs' complaint is their claim for what they call "preventive services;" i. e., their theory that the Fourteenth Amendment protection of fundamental rights requires the state to provide services they allegedly require to keep their large family together. The Court's function on this set of motions is not to test the bonds between the members of the Black family, but to determine if anything in the Constitution requires the state to affirmatively maintain those bonds by providing the Black family with any benefits other than what they already receive.

As has recently been observed by Judge Weinfeld:

"*Roe v. Wade* [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)] leaves no room to doubt that a 'fundamental' right to freedom of, and privacy in, family life exists, whether derived from the First, Ninth or

---

**5.** It is noteworthy that while official threats were apparently considered sufficient to create a justiciable controversy in *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), the Court found that the effect of the alleged threats to institute criminal proceedings in that case was to chill the exercise of the complainants' First Amendment rights. No such chill of any constitutional right is even impliedly alleged to have occurred as a result of the threat in this case.

Fourteenth Amendments, or some combination thereof. That children have the same right as adults to freedom of, and privacy in, family life is abundantly clear from *In re Gault* [387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)] . . . . But accepting the importance and social desirability of a permanent and stable home and family life for a child does not mandate a federal constitutional right thereto in the child's favor." *Child v. Beame*, 412 F.Supp. 593, 602, (S.D.N.Y. 1976). [footnotes omitted]

In *Child* the Court held that it is not proper to transmute the state's objective in providing adoption into a fundamental right to adoption, nor is it proper to reason that because a safe and decent home is an important component of family life the right to housing is a fundamental, constitutionally-protected right.

The plaintiffs in this case make no claim that their right to familial privacy has been interfered with *directly*, that they have been denied the statutorily-required dollar amount of welfare benefits, or that they have a direct right to housing or welfare benefits from the state. There is no claim that the four plaintiffs in foster care were pulled involuntarily from their home by the state or that they have any direct constitutional right to any payments or services denied them. Mrs. Black placed these children in foster care, and any direct claim to such benefits as a constitutional right would clearly be unavailing. *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972).

Rather than present such singular claims which, taken separately, would have no apparent basis in law or fact, plaintiffs present an amalgam thereof. It is argued that by refusing to give Mrs. Black and her children a larger apartment and counselling services which are allegedly necessary to the maintenance of their family and by presenting them with a system that allegedly provides more aid to foster care institutions than is provided directly to families through the Aid to Families with Dependent Children program,[6] the state has encouraged the foster care placement of four, and possibly more, of the Black children. That, plaintiffs contend, is not the alternative "least restrictive" of their rights to liberty in general and familial privacy in particular; that, they contend, is an unconstitutional burden on the exercise of welfare and housing privileges provided by the state.

By this argument plaintiffs ask the Court to borrow a page from the law on the First Amendment right to freedom of speech. It has long been the law in that area that a legitimate governmental purpose (such as providing necessaries for the poor) "cannot be pursued by means that broadly stifle fundamental personal liberties" when there are "less drastic means for achieving the same basic purpose." *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 241 (1960). This "less drastic means" or "least restrictive alternative" principle has been extended by a number of courts into the due process arena in the area of involuntary commitment of the

---

**6.** Plaintiffs cite a study by the Fund for the City of New York entitled '*In the Child's Best Interest,*' *An Examination of New York City's Child Welfare System* (November, 1971) for the proposition that "[t]hey [mothers on welfare] are penalized by a system which gives an agency $330.00 per month to care for a child, but only about a quarter of that (from welfare) to mothers to perform the same function."

They also note that when he ordered city defendants and defendant Fogarty of the Mission to assist plaintiffs' family in finding a larger apartment at a foster care review hearing a few years ago, Family Court Judge William Rigler declared:

It's costing $140.00 a day to keep the kids [in foster care] for two days. She [Mrs. Black] could have a house for a whole month. . . Let's not be penny wise and pound foolish when it's our pounds that are going down the drain.

It is plain that if the plaintiffs were merely claiming that defendants have failed to abide by Judge Rigler's order their prime avenue of legal recourse would be in the state courts. Instead, this Court must consider if this penny-wise, pound-foolish argument has a legitimate *constitutional* dimension. *See Dandridge v. Williams*, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

mentally ill and nearly all the cases plaintiffs cite involve the mentally ill or retarded. *Covington v. Harris*, 136 U.S.App.D.C. 35, 419 F.2d 617 (1969); *Wyatt v. Stickney*, 344 F.Supp. 373, 384 (M.D.Ala.1972), *aff'd sub nom.*, *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974); *Kesselbrenner v. Anonymous*, 33 N.Y.2d 161, 350 N.Y.S.2d 889, 305 N.E.2d 903 (1973).

The Supreme Court has specifically held that the *Shelton v. Tucker* "overreaching" principle has no place in an action challenging the State's administration of the AFDC program, *Dandridge v. Williams*, 397 U.S. 471, 484, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1969), and the proposed analogy to cases involving commitment and maintenance of the mentally ill was soundly and properly rejected in *Child v. Beame, supra* at p. 608:

> The civilly committed have been deprived of their liberty by the state while the state's action in taking the child plaintiffs into foster care, whether with an institution or foster parent, is not a deprivation of liberty. The state has merely provided a home for them in substitution for the one the parents failed to provide.

■ There is no constitutional obligation on the state either to provide plaintiffs with welfare or housing benefits or to affirmatively insure a given type of family life, and none may be created by inference and misdirection through the penumbral constitutional right to familial privacy. Though this Court has the power to insure that no state agency improperly *interfere* in the Black's family life, *see Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), it does not have the power to enforce the laudable sociological view of the importance of the family held by plaintiffs and their next friends. Plaintiffs would have the word "interfere" mean too much. A proper reading of the Constitution cannot include such semantic leaps. However much this Court may share plaintiffs' beliefs concerning the present distribution of the state's largesse, it is not empowered to enforce those views without a constitutional basis. There is no such basis here. The

Supreme Court has declared in no uncertain terms that

> "[t]he Constitution may impose certain procedural safeguards upon systems of welfare administration, *Goldberg v. Kelly* [397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)]. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Dandridge v. Williams, supra*, 397 U.S. at 487, 90 S.Ct. at 1163.

In citing certain cases in which the Supreme Court struck down unconstitutional burdens on the exercise of certain privileges, *United States v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co.*, 282 U.S. 311, 328–329, 51 S.Ct. 159, 75 L.Ed. 359 (1931); *see Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), plaintiffs appear to be arguing that the present system unconstitutionally requires plaintiffs and their mother to curtail their right to an unimpeded family life in order to enjoy the optimum amount of welfare, housing and foster care benefits offered by the state. This argument rests on their claim that under the present welfare system they all realize greater benefits if some of their number are in foster care than if they all lived with their mother and depended on AFDC aid alone. Though this argument has a certain superficial appeal, it must fail. It is nothing more than a logical variation on the "least restrictive alternative" theme already rejected by the Supreme Court in *Dandridge v. Williams, supra*, as noted above.

■ As yet another variation on their contention that their placement in foster care is "unsuitable", plaintiffs argue that that placement violates their right not to be subjected to cruel and unusual punishment under the Eighth Amendment. In light of their failure to allege any practice or condition "so bad as to be shocking to the conscience of reasonably civilized people", *Child v. Beame, supra*; *Martarella v. Kelley*, 349 F.Supp. 575, 597 (S.D.N.Y.1972),

this claim must be dismissed. The mere assertion that there are other more desirable means of supporting plaintiffs is hardly sufficient to support any action under the Eighth Amendment.

Plaintiffs' final constitutional claim is that defendants have engaged in a pattern and practice of denying and delaying welfare and housing services and have harassed, humiliated and intimidated Mrs. Black in her efforts to secure such services in such a way as to violate the Due Process Clause. The only apparent examples of such delays and discouragements are plaintiffs' contentions that defendants have dragged their feet in providing her with the counselling services and the size apartment Mrs. Black claims is necessary to keep her family together. It is apparently their claim that by such bureaucratic foot-dragging in their case defendants have done indirectly what they could not do directly; i.e., they have, in effect, terminated or reduced a benefit to which plaintiffs are statutorily entitled without the due process hearing required by *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

▮▮▮▮ Two Courts in this Circuit have held, and this Court agrees, that in certain cases bureaucratic delay in processing and approving a benefit to which a person is statutorily entitled can amount to a deprivation sufficient to bring the Due Process clause into play. *Perez v. Lavine*, 378 F.Supp. 1390 (S.D.N.Y.1974); *Nelson v. Sugarman*, 361 F.Supp. 1132 (S.D.N.Y.1972). However, by failing to set out either in their answering papers or their complaint any statute or other state pronouncement entitling them to an apartment of a particular size or a given type of counselling service, the plaintiffs have also failed to make a case for any application of this due process concept to this case. There is absolutely no indication of any mutually explicit understanding between plaintiffs, their

mother and the state, *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), or, for that matter, anything but plaintiffs' and Mrs. Black's mere subjective expectancies, *Roth v. Board of Education*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), to support their claim of a quasi-property interest in a larger apartment or counselling services.

▮▮▮ As noted above, the state's refusal to affirmatively support the Blacks' familial privacy (whether by outright denials of services or foot-dragging) is not a constitutional deprivation. It cannot be bootstrapped into such a deprivation by the invocation of the Due Process Clause and those cases that properly apply that clause to protect families whose welfare benefits are being effectively terminated or reduced. *Goldberg, supra* ; *Perez, supra* ; *Nelson, supra*. Short of the claimed threat to place more of the children in foster care, plaintiffs have not provided this Court with a single factual allegation sufficient to support their broad claim of harassment, nor have they provided allegations of a *direct* interference with familial privacy or the denial of any statutory entitlement without due process of law.

On the other hand, the New York legislature and Courts have determined that the rejection of an applicant's initial request for public housing ought to and does give rise to minimal due process rights (i. e., a personal interview and a statement of the reasons for the rejection). N.Y. Public Housing Law § 156–a (McKinney Supp. 1975); *Sumpter v. White Plains Housing Authority*, 29 N.Y.2d 420, 328 N.Y.S.2d 649, 278 N.E.2d 892, *cert. denied*, 406 U.S. 928, 92 S.Ct. 1803, 32 L.Ed.2d 130 (1972); *Velez v. Chrisitian*, 75 Misc.2d 159, 347 N.Y.S.2d 536 (Sup.Ct. Kings Co. 1973). In addition, 42 U.S.C.A. § 1437d(c)(3) (1976 Pocket Part) provides similar protection to tenants in federally-subsidized housing.[7] *See also Da-*

---

7. The record does not indicate whether or not Mrs. Black's apartment is in a federally-subsidized building. For the purposes of managing such federally-subsidized buildings, the Housing and Urban Development agency has declared that

[i]f HUD or the PHA [public housing authority], as the case may be, determines that a Contract unit assisted under this Part is not Decent, Safe, and Sanitary by reason of overcrowding [increase in family size] . . . housing assistance payments with respect to

*vis v. Toledo Metropolitan Housing Authority*, 311 F.Supp. 795 (N.D.Ohio 1970) (in which case the Court held that a rejected applicant for public housing is entitled to a full post-rejection evidentiary hearing).

Whether or not such a personal interview or even a full evidentiary hearing is required in the case of a public housing resident's request for transfer to larger quarters would seem to be an open question. However, the plaintiffs' complaint and their answering papers on this motion do not clearly raise that question or even make reference to the above-cited authorities. It may be that by this action plaintiffs only seek to vindicate an alleged right not to be refused a larger apartment or counselling services without being given at least a personal interview and the reasons for the refusal. But their complaint and answering papers do not sufficiently specify such a right, nor do they point to a statute giving them an entitlement sufficient to support even such minimal due process.

■■■ The only statutes cited by plaintiffs are a number of federal AFDC and New York public welfare goal-setting provisions. 42 U.S.C. §§ 601, 608, 625, 1397; 45 C.F.R. § 223.110(a); New York Family Court Act § 255; New York Social Services Law §§ 407.1, 344.2; 18 New York Codes, Rules and Regulations § 450.8(g).[8] These statutes, which plaintiffs claim have been directly violated by defendants, set the purposes and objectives of the various federal and state welfare schemes. While they all clearly establish a governmental policy of encouraging family life through various forms of benefits to needy families, none of them purport to create an individual right to have that policy perfectly achieved or

even pursued in any particular manner. As noted by the Court in *Albany Welfare Rights Organization Day Care Center, Inc. v. Schreck*, 463 F.2d 620, 624 (2d Cir. 1972), *cert. denied*, 410 U.S. 944, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973),

> Congress did not seek to impose a rigid administrative system on the states that elected to adopt [a plan to aid "needy families with children"]. Each state is free to choose the administrative system which is most appropriate to the state's needs. Local administration of a plan is explicitly sanctioned by the Act. See, e.g., 42 U.S.C. §§ 602(a)(1), (3), (15)(F) (1970).

It is apparent, therefore, that plaintiffs do not enjoy an entitlement as a result of these goal-setting statutes. Thus, plaintiffs have failed entirely to set out any factual allegations indicating the denial of a statutory entitlement and the corresponding denial of due process. They have, in fact, failed to indicate whether or not they even seek procedural due process protection; and any claim for substantive due process would clearly be unavailing. *See supra.*

The complaint on this score is so vague and conclusory that it must be dismissed as legally insufficient. *Albany Welfare Rights Organization, supra* ; *Avins v. Mangum*, 450 F.2d 932 (2d Cir. 1971); *Powell v. Workmen's Compensation Board of the State of New York*, 327 F.2d 131 (2d Cir. 1964).

The remainder of the complaint rests on the Court's power to assert "pendent" jurisdiction over the claims based on the above-described state and federal goal-setting statutes. *See Almenares v. Wyman*, 453 F.2d 1075, 1083 n. 10 (2d Cir. 1971), *cert.*

---

such unit will not be abated, unless the Owner fails to offer the Family a suitable unit as soon as one becomes vacant and ready for occupancy. In the case of an overcrowded unit, if the Owner does not have any suitable units or if no vacancy of a suitable unit occurs within a reasonable time, HUD (or the PHA) will assist the Family in finding a suitable dwelling unit and require the Family to move to such a unit as soon as possible. 24

C.F.R. § 1273.218(h) (1975), amended effective April 29, 1975, 24 C.F.R. § 880.223 (1976), to substitute bracketed matter for word "overcrowding."

8. Plaintiffs cite these statutes as creating independent claims for relief. They do not, however, challenge the state plan submitted to and approved by the Secretary of HEW pursuant to the AFDC statute.

**610**

*denied,* 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972). Though, as previously noted, there is a serious question as to whether or not these statutes may be used as the basis for an individual's claim of right or a private cause of action based on such a right, the Court need not reach that question in considering these purely statutory claims. Those constitutional claims that are adequately articulated in the complaint are so obviously without merit that they cannot form the basis for the exercise of this Court's present jurisdiction. *Goosby v. Osser,* 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973); *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Plaintiffs having asserted the doctrine of pendent jurisdiction as the only basis for the Court's subject matter jurisdiction over these statutory claims, this portion of the complaint must be dismissed.

Accordingly, the complaint is dismissed in its entirety as to all defendants.

SO ORDERED.